# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-1887V**

| | |
|---|---|
| JEREMY BRUCE,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: September 30, 2026 |

*Ramon Rodriguez, III, Siri & Glimstad, LLP, Richmond, VA, for Petitioner.*

*Madylan Louise Yarc, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On October 26, 2023, Jeremy Bruce filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on November

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

23, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties were unable to settle the claim, and have now briefed entitlement and damages (ECF Nos. 40, 41, 43). For the reasons set forth below, I find that Petitioner's shoulder pain likely began within 48 hours of vaccination, his symptoms were primarily located in and originated in his shoulder, he did not have another condition that would explain his post-vaccination symptoms, and that he is otherwise entitled to compensation. For damages, I award **$40,000.00** for actual pain and suffering, plus **$1,889.24** for past unreimbursable expenses.

## I. Factual Evidence

### A. Medical Records

Petitioner received a flu vaccine in his left deltoid on November 23, 2020. Ex. 5 at 2. The following month (December 29, 2020), he saw an ear, nose, and throat specialist concerning an unrelated chronic condition, without mentioning shoulder pain. Ex. 4 at 7-8. He later saw a dentist for a routine examination and cleaning on January 14, 2021, and did not report shoulder pain. Ex. 6 at 10.

On March 8, 2021 (now three and a half months after vaccination), Petitioner saw an orthopedist for evaluation of left shoulder pain. Ex. 7 at 2. He reported that his shoulder was asymptomatic until December 2020, when he received a flu vaccine and "immediately after the injection" experienced shoulder pain. *Id*. The pain progressively worsened over the following hours. *Id*. He had hoped it would resolve with time, but it had persisted for the previous several months. *Id*. He rated his pain seven out of ten. *Id*. He described a stabbing sensation and numbness, tingling, and radiating pain into his left upper extremity, with some neck pain. *Id*. The record of this appointment lists an onset date of December 4, 2020. *Id*.

On examination, Petitioner's shoulder exhibited limited range of motion ("ROM") in flexion, internal rotation, and external rotation, with moderate weakness. *Id*. at 3. Petitioner was assessed with left shoulder adhesive capsulitis, rotator cuff tendinitis, pain secondary to flu shot with possible myositis, left upper extremity numbness of unclear etiology, and cervical spondylosis. *Id*. An MRI was recommended. *Id*.

Petitioner returned to the orthopedist on March 26, 2021. Ex. 7 at 7. He explained that he had received a flu vaccine "back in December" and subsequently developed significant shoulder pain. *Id*. His MRI showed a nondisplaced labral tear, rotator cuff tendinitis, and subcoracoid bursitis. *Id*. at 6. Petitioner was assessed with rotator cuff tendinitis, capsulitis, and subacromial bursitis of the left shoulder with an undisplaced

labral tear. *Id*. He was given oral steroids, and physical therapy ("PT") was recommended. *Id*.

Petitioner underwent a PT evaluation on April 5, 2021. Ex. 8 at 2. He reported the onset of left shoulder pain and ROM limitations, with shooting pain and numbness to his hand, in December following vaccination. *Id*. Oral steroids had resulted in "significant improvement." *Id*. He rated his pain five out of ten, ranging to six out of ten at worst. *Id*. On examination, his left shoulder exhibited limited ROM and decreased strength. *Id*. at 3. Petitioner attended a total of four PT sessions between April 5 and April 16, 2021. *Id*. at 6-11.

Petitioner returned to the orthopedist on April 30, 2021 "for follow-up on his left shoulder predomin[antly] as well as cervical spine." Ex. 7 at 9. He exhibited "fairly significant improvement," after taking oral steroids, which had diminished inflammation. *Id*. On examination, his ROM was "greatly improved," and now within ten degrees of normal in all planes. *Id*.

On June 3, 2021, Petitioner's orthopedist administered a steroid injection to Petitioner's left shoulder. Ex. 7 at 11. Petitioner reported moderate shoulder pain, and his ROM was unchanged. *Id*. Three months later (September 10, 2021), he returned for a second steroid injection. *Id*. at 13. The first steroid injection had been beneficial, though his left shoulder problems persisted. *Id*. He also described a "longstanding issue with his cervical spine" and "some symptomatology that seems to be emanating from his neck" that persisted, although the orthopedist stated that this "does not seem to be his primary complaint today. He localizes his pain laterally to his shoulder." *Id*. The orthopedist thought that Petitioner had two problems, explaining that he thought the neck was a "slight component" of his shoulder issue, but that the bigger component was the shoulder itself. *Id*. at 14.

Petitioner underwent a PT evaluation on October 15, 2021. Ex. 8 at 12. He reported "more pain with his L shoulder than neck," along with occasional numbness in his left fingers. *Id*. He rated his pain two out of ten, ranging to six out of ten at worst. *Id*. On examination, his left shoulder exhibited full passive ROM. *Id*. at 13. He attended a total of three PT sessions between October 15 and November 19, 2021. *Id*. at 12-21.

Over 14 months later, on February 1, 2023, Petitioner saw a chiropractor for back, leg, and hip pain. Ex. 9 at 2. He continued seeing the chiropractor for unrelated concerns. *Id*. at 3-41. On July 13, 2023 – now over a year and a half since his last shoulder treatment – Petitioner complained to the chiropractor about an "aching discomfort in the back of the left shoulder." *Id*. at 42.

### B. Testimonial Evidence

Petitioner submitted two declarations in support of his claim. Exs. 1, 18. He states that as soon as the vaccine was injected, he felt "instantaneous" and excruciating pain.

Ex. 1 at 1. After a five-minute walk home, he noticed his left shoulder was already starting to bruise and he experienced weakness and difficulty lifting his arm. *Id*. He expected the pain to subside soon and treated at home with heat, ice, and over-the-counter medications. *Id*. at 2. Instead of improving, the pain worsened. *Id*.

Petitioner attributes his delay in seeking formal medical care to the intervening holidays and his job transferring him from Washington State to Florida. Ex. 1 at 2. He was only able to attend a few PT appointments due to ongoing work commitments, and did the exercises at home. *Id*. He explains that his job in Florida was located two and a half hours from his home, and thus he traveled to his workplace on Tuesday mornings and returned home on Thursday evenings, making it difficult to attend to personal matters such as medical care. Ex. 18 at 3.

Petitioner contends that his vaccine injury has limited his ability to play with his young children, open doors, put on his seatbelt and steer, and perform household duties. Ex. 18 at 2-3. He asserts that his shoulder symptoms did not fully resolve until the fall of 2023. *Id*. at 5.

Petitioner's spouse submitted a declaration in support of his claim. Ex. 2. She states that when Petitioner arrived home after receiving a flu vaccine in November 2020, he was in "obvious discomfort" and showed her a bruise at the injection site on his shoulder. *Id*. at 1. His ability to engage in household activities and playing with the kids was adversely affected. *Id*.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are

also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly

recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Parties' Arguments on Entitlement

Respondent asserts that Petitioner has not established that the onset of his shoulder pain occurred within 48 hours of vaccination. Response, filed Aug. 4, 2025, at *9 (ECF No. 41) ("Resp."). Respondent highlights Petitioner's three-and-a-half-month delay in seeking care, along with his report to several treaters that his pain began in *December* – thus more than 48 hours after vaccination. Resp. at *10-11. Respondent takes issue with Petitioner's subjective relation of his shoulder pain to vaccination, and asserts that Petitioner's intervening visits to other providers – an ear, nose, and throat doctor and a dentist – suggest that he was able to seek care for his shoulder if his pain began immediately after vaccination. *Id*.

Respondent further asserts that Petitioner cannot satisfy the third or fourth QAI requirement, because he consistently reported pain outside of his vaccinated shoulder, including numbness and tingling with radiating pain to the neck and shooting pain and numbness into his hand and fingers. Resp. at *12-13. And Respondent notes that Petitioner was diagnosed with cervical spondylosis, which he asserts is another condition that could explain Petitioner's symptoms. *Id*.

Petitioner asserts on reply that he consistently related his pain to vaccination, although he misstated the month in which he received the vaccine. Petitioner's Reply, filed Sept. 2, 2025, at *3-4 (ECF No. 43) ("Reply"). And he notes that his PT records show that he was treated with rotator cuff and shoulder impingement protocols. Reply at *7. Although he was diagnosed with cervical spondylosis, the treater who made this diagnosis focused on his left shoulder rather than his neck. *Id*. And he asserts that his left shoulder symptoms primarily arose from the shoulder itself, even if his neck contributed a slight component. *Id*. at *8-9.

### C. Factual Findings Concerning Onset

The record preponderantly (if weakly) supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Although he did not seek medical treatment until three and a half months post-vaccination, such delay is not uncommon in SIRVA cases. *Tully v. Sec'y of Health & Human Servs*., No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset occurred within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs*., No. 19-1301V, 2023

WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

Admittedly, some records refer to onset having occurred in December 2020 – which would be beyond 48 hours post-vaccination. But this appears to be a result of Petitioner misremembering when he received the vaccine, as he told his orthopedist that he received the flu vaccine in *December* and suffered pain thereafter. Ex. 7 at 2, 7. And the record of his first appointment, which lists an onset date of December 4, 2020, also states that he reported that his shoulder pain began "immediately after" vaccination – further suggesting that Petitioner incorrectly recalled having received the vaccine in December. *Id*. at 2.

Petitioner consistently linked the vaccine to immediate pain. And he submitted testimonial evidence that he felt "instantaneous" excruciating pain and, after a five-minute walk home post-vaccination, his arm was already weak and difficult to lift. Ex. 1 at 1. Petitioner's spouse testified that when he arrived home after vaccination, he was in "obvious discomfort." Ex. 2 at 1. The medical records cited above, bolstered by testimonial evidence, support a finding that the references to onset occurring in December likely resulted from Petitioner misstating the vaccination date, rather than his pain beginning more than 48 hours after vaccination.

**D. Petitioner's Pain and Limited ROM were Primarily Located in, and Originated in, His Left Shoulder**

Respondent focuses on Petitioner's report of pain extending into his neck, hand, and fingers. I have previously found, however, that references to symptoms originating in a claimant's shoulder and resulting in incidental symptoms elsewhere do not necessarily prevent satisfaction of this SIRVA element. *See Valdez v. Sec'y of Health & Human Servs*., No. 21-0394V, 2024 WL 1526536, at *6-7 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (finding third QAI satisfied despite pain radiating to upper arm and forearm because the petitioner *primarily* experienced a shoulder injury consistent with SIRVA); *Cross v. Sec'y of Health & Human Servs*., No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) ("claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered *to* the shoulder *primarily* caused pain there") (emphasis in original).

The orthopedist's belief that Petitioner's neck was "a slight component of his ongoing shoulder issue" could (if supported by other record evidence) provide a basis for finding this element not satisfied. However, the basis for this statement is not clear. And while Petitioner reported longstanding pre-existing neck problems, his shoulder did not exhibit symptoms until after vaccination. Furthermore, his treatment was limited to his shoulder. Thus, while this is a close case, the preponderance of the evidence supports a

finding that Petitioner's symptoms primarily were located in, and originated in, his shoulder.

### E. Petitioner has Established that He Did Not Have Another Condition That Would Explain his Post-Vaccination Symptoms

While Petitioner was diagnosed with cervical spondylosis and left arm numbness of unclear etiology, and reported a longstanding cervical spine issue, the record does not support a finding that these conditions would explain Petitioner's post-vaccination symptoms. When Petitioner sought care for shoulder pain, his healthcare providers evaluated and treated his shoulder, not his neck or other conditions. And while Petitioner acknowledges a pre-vaccination cervical spine problem, the record does not indicate that this concern was symptomatic or required treatment before vaccination. As such, the record preponderantly supports a finding that Petitioner's pre-existing cervical spine issues and other conditions would not explain his post-vaccination symptoms.

### F. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of shoulder pain that would explain his post-vaccination symptoms. Exs. 3, 4. He experienced residual effects of his condition for more than six months. Ex. 7 at 11. He received a covered vaccine in the United States. Ex. 5 at 2. And he states that he has never received or collected an award or settlement of a civil action for damages for his vaccine related injury. Ex. 10.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, he has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Staub v. Sec'y of Health & Human Servs.*, No. 23-1611V, 2026 WL 800520 (Fed. Cl. Spec. Mstr. Mar. 4, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec.

Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

**B. Parties' Damages Arguments**

Petitioner seeks a pain and suffering award of $85,000.00, citing decisions in *Dhanoa*, *Weber*, *Smith*, *Decoretz*, *Marino*, and *T.E.*, in which the claimants were awarded between $70,000.00 and $95,000.00.[5] Motion for Ruling on the Record, filed June 16, 2025, at *14-22 (ECF No. 40) ("Mot."). Petitioner asserts that his injury persisted for "approximately 11 months," with Petitioner thereafter continuing home exercises and chiropractic care which Petitioner suggests result in a "2-year plus" injury duration. *Id*. Petitioner emphasizes the impact of his injury on his quality of life, particularly difficulties picking up and playing with his young children. *Id*. And he requests reimbursement of $1,937.52 in out-of-pocket medical expenses. *Id*.

Respondent proposes a pain and suffering award of $23,000.00, citing *Hiatt*, in which the claimant was awarded $25,000.00 in pain and suffering, and *Pistulka* and *Turnquest*, in which the claimants were each awarded $30,000.00.[6] Resp. at *17-24. Respondent characterizes Petitioner's injury as "very mild," noting that he did not seek treatment for his shoulder for three and a half months. *Id*. Although Petitioner initially reported high pain levels, by five months after vaccination he rated his pain five out of ten, and by 11 months post-vaccination, his pain was two out of ten. *Id*.

Respondent asserts that the cases Petitioner cites were in the mild to moderate range, with those claimants receiving "nearly double" the amount of treatment as Petitioner. Resp. at *22-24 Respondent asserts that Petitioner should be awarded $1,889.24 in past unreimbursable expenses, which includes all proposed expenses other

---

[4] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[5] *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018); *Weber v. Sec'y of Health & Human Servs.*, No. 17-399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. April 9, 2019); *Smith v. Sec'y of Health & Human Servs.*, No. 21-409V, 2023 WL 9288086 (Fed. Cl. Spec. Mstr. Dec. 11, 2023); *Decoretz v. Sec'y of Health & Human Servs.*, No. 19-0391V, 2021 WL 2346468 (Fed. Cl. Spec. Mstr. May 7, 2021); *Marino v. Sec'y of Health & Human Servs.*, No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. March 26, 2018); and *T.E. v. Sec'y of Health & Human Servs.*, No. 19-0633V, 2021 WL 2935751 (Fed. Cl. Spec. Mstr. May 7, 2021).

[6] *Hiatt v. Sec'y of Health & Human Servs.*, No. 23-1560V, 2025 WL 1542314 (Fed. Cl. Spec. Mstr. May 13, 2025)*; Pistulka . v. Sec'y of Health & Human Servs.*, No. 21-1429V, 2025 WL 2115479 (Fed. Cl. Spec. Mstr. June 27, 2025); and *Turnquest . v. Sec'y of Health & Human Servs.*, No. 21-0065V, 2024 WL 3665961 (Fed. Cl. Spec. Mstr. July 2, 2024).

than $48.28 requested for Petitioner's chiropractic care in 2023, which Respondent maintains is unrelated to his shoulder injury. *Id*. at *24.

In reply, Petitioner disagrees with Respondent's view that his injury was mild, asserting that the cases cited by Respondent involved much more limited treatment and are not useful comparisons. Reply at *10-15. With respect to unreimbursable expenses, Petitioner disputes Respondent's contention that his 2023 chiropractic care is not related to his vaccine injury. *Id*. Petitioner states that he began treating with a chiropractor in February 2023 for low back pain, and in July 2023 he complained of, and was treated for, left shoulder pain. *Id*. Petitioner asserts that he continued to experience episodic pain/discomfort in his left shoulder until the fall of 2023, citing his supplemental declaration, Ex. 18 at 4. *Id*. And he asserts that a July 12, 2023 telehealth encounter documents him as having limited upper body strength due to his prior shoulder injury. *Id*. (citing Ex. 12 at 17).

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner's injury falls in the mild to moderate range, and persisted for a year. When Petitioner stopped seeking treatment for his shoulder in November 2021, his ROM had returned to normal and he had low levels of residual pain. Although he asserts that his chiropractic care in July 2023 – an isolated report of shoulder pain nearly two years after he stopped treatment – is related to his vaccine injury, the record does not preponderantly support this contention. Nor is Petitioner's supplemental declaration (asserting that his symptoms did not fully resolve until the fall of 2023) sufficient. Such testimonial evidence *might* suffice to corroborate other compelling evidence of residual effects, such as medical records. However, it cannot, bolstered only by the July 2023 chiropractic record, support a finding that Petitioner's injury persisted through that time. Instead, it is more likely that Petitioner's injury largely resolved by late 2021, and that his 2023 report of shoulder discomfort is unrelated to his vaccine injury.

When Petitioner first sought care for his shoulder injury, he reported a moderate to high pain level (seven out of ten). He underwent two steroid injections, one round of oral steroids, and seven formal PT sessions, with good results. His ROM "greatly improved" to almost normal with oral steroids. When he stopped seeking care in late 2021, he rated his pain two out of ten, ranging to six at worst, and he exhibited full ROM.

The cases Petitioner cites involve injuries that persisted for significantly longer, with the exception of *T.E.* And *T.E.* involved a claimant who sought care just 18 days after vaccination – suggesting a significantly more severe injury. On the other hand, the cases

Respondent cites involve milder injuries that resolved much sooner than did Mr. Bruce's injury.

I find that this case bears many similarities to *Valentine v. Sec'y of Health & Human Servs.*, No. 22-0340V, 2025 WL 1707733 (Fed. Cl. Spec. Mstr. May 16, 2025), in which a petitioner was awarded $45,000.00 in pain and suffering. The injury duration of the that petitioner and Mr. Bruce are similar, and both treated with steroid injections and PT – with Mr. Bruce receiving one more steroid injection, but attending one less PT session. Both somewhat delayed seeking care, although Mr. Bruce's treatment delay is nearly double that of the *Valentine* petitioner – suggesting that Mr. Bruce's injury was less severe. Both claimants regained functional ROM with treatment, and reported similar pain levels.

Taking these factors into consideration, I find that an award of **$40,000.00** for pain and suffering is appropriate in this case.

**D. Unreimbursable Expenses**

The sole dispute between the parties concerning unreimbursable expenses concerns whether $48.28 for chiropractic care in 2023 should be included. I determine that this care was unrelated to Petitioner's vaccine-related injury, and thus is not reimbursable. Although Petitioner mentioned shoulder pain at this appointment, this appointment took place over a year and a half after he had stopped seeking treatment for his shoulder injury, suggesting that it had long-since resolved. The *only* evidence suggesting this care could be related to his vaccine-related injury is Petitioner's general statement in his supplemental declaration that his "left shoulder symptoms did not completely resolve until the Fall of 2023." Ex. 18 at 4. This is not sufficient to link this care to his vaccine injury.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $40,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[7] Additionally, I find that Petitioner is entitled to **$1,889.24 in unreimbursable expenses**.

---

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $41,889.24, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.